Texas, Sabine Valley & Northwestern Railway
Company et al. v. H. H. Peden.

Decided April 27, 1903.

**1.—Assumed Risk—Railroad Brakeman.**

A railroad freight brakeman who knows that the engine operating the train on which he is working is not supplied with air brakes, assumes the risk of injury resulting from their absence.

**2.—Same—Cars Left Uncoupled.**

Where a brakeman, while passing along the tops of a string of cars on a siding against which a train was being backed, was caused to fall between them when the impact occurred, because they were not coupled together, and so were driven suddenly apart, and he knew that the rule of the company requiring cars so left on sidings to be coupled together was not observed at

that siding and others on the road, the risk resulting from the cars being uncoupled was one that he assumed.

**3.—Same—Defective Appliance—Knowledge.**

Knowledge of a defect in an appliance carries with it knowledge of the increased danger from its use, unless there is inexperience on the part of the servant of which the master had notice.

Appeal from the District Court of Shelby. Tried below before Hon. Tom C. Davis.

*Bryarly & Polly* and *Young & Stinchcomb,* for appellants.

*Blount & Garrison,* for appellee.

GILL, Associate Justice.—This is a suit by H. H. Peden, plaintiff below, to recover of defendant railway companies damages for personal injuries alleged to have been suffered by him as a result of the negligence of the defendant companies. From a verdict and judgment in favor of plaintiff for $2000 the companies have appealed, and complain that the judgment is erroneous, among other things, because the undisputed facts show that plaintiff's injuries were the result of a risk he assumed. After a careful inspection of the record and due consideration of the briefs we are of opinion that a disposition of this assignment will determine this appeal.

The plaintiff at the time of his injury was a brakeman on one of defendant's freight trains. On the day of his injury his train was standing at Carthage, Texas, on defendant's line of road, and it became necessary to back the train in upon the siding in order to allow another train to pass. The train entered the siding from the south. The grade of the siding from that point north sloped slightly downward. There were four box cars upon the siding, and in backing the train in, these cars had to be pushed down toward the opposite end. The car next to the incoming train was standing about 100 feet from three others which were standing close together. They were not coupled together, but plaintiff did not know whether they were or not.

Plaintiff was called as a witness and stated the facts as follows: "Mr. Whitney, conductor in charge of the train I was working on, ordered me to have our train placed in on the side track, so that the train to Longview could pass. In accordance with these instructions I signaled the engineer to go upon the main line for the purpose of backing in on the switch. Mr. Ed Smith was sent ahead to signal the train that was to come from Boren. I threw the switch to let the train in on the side track, and signaled the engineer to back up. I was on the rear end of the coach, which was the rear end of the train. As the train came backing down on the side track there was a car standing by itself, and after I set the brake on the coach I jumped down and ran to the car for the purpose of setting the brake on it. Just about the time I reached the south end of the car the rear end of the coach

which was attached to the train backing in on the side track struck the car, and I immediately got upon the car and set the brake on that car, and then climbed down and ran to three other cars which were standing further down the side track. These three cars were about 100 feet, or three car lengths, from the car I first set the brakes on before that car was moved. After getting down from the first car I ran down the track to where the three cars were standing and climbed up on the south end of the first car and ran to the brake, which was on the north end of the first car. I tried to set this brake and found it would not work. I then stepped across to the south end of the second car and set the brake on that car, and then ran to the north end of the second car for the purpose of setting the brake on the third car, and just about the time I reached the north end of the second car and went to jump to the south end of the third car the train came backing down the track and struck the first car knocking the third car out from under me. The train struck the car just as I was in the act of jumping, and when I saw the third car, which was the north car, shoot out from under me, I threw myself back and fell right between them, striking my right foot on the crossties, breaking my foot. The three last cars were standing on the side track as if they were coupled together, and I thought they were. Mr. Whitney, the conductor in charge of the train on which I was braking, gave me orders to always leave the cars when placed on the side track coupled, and I always tried to follow out these instructions. I possibly might have failed to couple them some time, but always tried to see that all the cars I placed in were coupled. If the three cars had been coupled together I could easily have jumped from the second to the third car. The cars were standing still when I went to jump from the second to the third car, and were struck by the train backing in on the siding just as I made my effort to jump, which caused me to fall. * * * From the time I went to work on the M. T. & S. P. Railway and up until I was injured ours was the only train that ran over that track, and we handled all the cars placed upon the side tracks on that road between Carthage and Timpson and some of the cars placed upon the side track at Carthage. We placed in and pulled out every car placed on every side track between Carthage and Timpson during that time. We went in on the side track every day at Carthage during that time, and either placed in or pulled out cars and did some switching. * * * When the north end of the coach struck the south end of the first car that was apart from the other three cars it set this car to rolling and it continued to roll from the time the coach struck it until it struck the cars at the time I fell, and during all that time the car that was first struck had not struck the other three cars and didn't strike them until I was in the act of jumping from the car at the time I fell. I was running to this north car for the purpose of setting the brake on it to keep the three other cars from running out on the main track. I heard Smith coming back with the train all this time,

and saw that he was going fast. When I was running to get to this third car I saw the engine and cars coming, and saw the speed at which they were coming. I knew the brakes were not set on the cars when I got upon them. I was on them for the purpose of setting the brakes. I knew the engine had no air equipment, and knew this during the time I worked for the railroad prior to my injury. I knew this side track at Carthage was sloping towards the north and knew this prior to my injury during the time I worked for the railway. We placed cars on the side track at Carthage, Ramsey's switch, Butler's switch, Wade & Miller's switch, and other switches on the road, and where we would put cars on these switches I always tried to leave them coupled and with the brakes set. Whenever the mill men would request us we would separate the cars and spot them for them, and these that were spotted were left uncoupled. All the mill men had crowbars for the purpose of moving the cars from one place to another, and when we would leave them coupled they would move them, and when we would go in to pick them up we would find them uncoupled. It was a frequent occurrence for us to find cars uncoupled on the side tracks at Ramsey's switch, Butler's switch, Wade & Miller's switch and Carthage. Mr. Whitney had a crowbar with which to move cars from one place to another and it was a frequent occurrence for us to find cars uncoupled and the brakes not set on the side track at Carthage, prior to the time of my injury."

The plaintiff alleged as grounds for recover: (1) Negligence on the part of the companies in furnishing an engine without air brakes, by reason of which defect it could not be safely handled in coupling and uncoupling cars. (2) Negligence on the part of the companies in failing to have the cars upon the siding coupled together so that when struck by the incoming train they could not separate.

As to the condition of the engine, defendant pleaded that plaintiff had knowledge of its condition, and therefore assumed the risk of the danger attending its use in that condition. As to the fact that the cars on the siding were not coupled, defendant pleaded assumed risk and contributory negligence on the part of plaintiff.

Liability can not be predicated upon the first ground alleged, for plaintiff testified that he knew the engine was not equipped with air brakes. Having such knowledge he assumed the risk of working with it in that condition.

As to the other ground, namely, the uncoupled cars, the plaintiff's own statement exonerates the defendants. In the first place the plaintiff knew that not all the cars on the siding were coupled, for the first car was stated by him to be 100 feet from the others. Thus, if there was a rule of the company that the cars upon the siding should be left coupled, he was put upon notice that it had not been observed as to this siding. It further appears from his statement that no such rule was even generally observed. That the road ran through a lumber country, and at many of the sidings were sawmills. That upon such

sidings cars would be placed by the operatives of trains at any point designated by the mill owner or mill hands.  In addition to this the mill hands were supplied with crowbars to enable them to move the cars from place to place to suit their convenience.  Thus the plaintiff knew that the company not only had not undertaken to keep the cars on the siding coupled together, but on the contrary the facts and the custom which was known to the plaintiff show that he had no reason to expect them to be coupled.  His injury was due to the fact that the cars were uncoupled, and that, without taking the precaution to ascertain whether they were or not, he undertook to jump from one to the other when he knew the train was backing against them in response to his own signal and at a speed which he confesses he knew.

Plaintiff's account of the accident is not aided or supplemented by any other evidence in the record.  He testifies to every fact upon which he could possibly predicate liability, and his own statement leaves no room for two opinions.  Clearly the condition of the engine was a risk he assumed, even if it should be held that it bore any causal relation to the accident.

As to the uncoupled cars, it is equally clear that with the knowledge in his possession he assumed the risk of his effort to jump from one to another, when an approaching train was about to strike it.

For the reasons stated the judgment of the trial court is reversed and judgment is here rendered for appellants.

*Reversed and rendered.*

ON MOTION FOR REHEARING AND TO FIND ADDITIONAL FACTS.

In the motion for rehearing appellee insists that this court has committed error upon three points:  (1)  In holding that under the facts appellee had assumed the risk of the failure of the company to equip the engine with air brakes.  (2)  In holding that he could not rest his right to recover on the speed at which the train was backing at the time of his injury.  (3)  In holding that he assumed the risk of the uncoupled cars.

In this connection we are requested to find specifically that according to the record no witness testified that appellee knew of the danger attendant upon the use of an engine not equipped with brakes.

It is a fact that there is no such testimony in the record, but it is also true that appellee had been working for the company upon that particular train for about six months, and according to his own testimony had engaged daily in the task of placing cars upon the various side tracks along the line.  We supposed, upon such a state of facts, his knowledge that the absence of the brakes would make a difference and add to the danger would not be seriously questioned.  It seemed and still seems to us a matter of course.  There is also a general rule of law to the effect that knowledge of a defect in an appliance carries with it

knowledge of the increased danger of its use. Railway Co. v. Bradford, 66 Texas, 237; Railway Co. v. Somers, 78 Texas, 441.

The application of this rule might be avoided by allegation and proof of inexperience on the part of appellee of which the company had notice, but no such allegation was made, and not even the appellee denied while on the stand that he had such knowledge. But even if (in view of the fact that the train traveled only 100 feet while appellee climbed upon two cars, set two brakes, tried to set two more, thus covering double that distance) a finding that the train was going fast could not rest undisturbed, there is another reason why neither the defect in the engine nor the speed of the train can be considered in support of the judgment. It is a matter which we did not discuss in our main opinion, because we were content to dispose of the case upon appellee's statement of the facts, being then of opinion, as we are now, that no cause of action was disclosed thereby.

The reason referred to is this: The petition alleges that the backing train struck the three cars and put them in motion before appellee undertook to set the brakes thereon, and that for that reason he ran to the north car to set the brake on it. That by reason of its being uncoupled it had begun to separate from the others, and appellee, not knowing it was uncoupled, was unable to stop himself and fell. Appellee denies the truth of this allegation on the stand, and states the facts as indicated in the main opinion. If our construction of the pleading is correct, it is plain there is nothing left upon which he can consistently seek to rest the judgment save the uncoupled cars.

Upon the issue of the uncoupled cars the appellee insists that we have misconstrued the meaning of the requirement that cars should be left uncoupled when placed on the side track, and that a reasonable construction would be that when cars were left near together, having the appearance of being coupled, they should be left coupled. We think this is perhaps the reasonable meaning of the instructions of the conductors as testified to by plaintiff, and perhaps plaintiff is right in his contention that we gave undue weight to the fact that one of the four cars in question was not near enough to be coupled to the other three. The idea in the mind of the court was that if all the cars had been left on the siding coupled, the presence of the car disconnected from the others made it plain that their status had been disturbed by the mill men, and put plaintiff on notice that the others might also have been disturbed. But it is unnecessary to resort to such refinements. Beyond and back of it all stands the undisputed fact that no such requirement was in force as authorized plaintiff to act upon the assumption that the cars were coupled. The statement of the superintendent that no such rule was promulgated or in force stands undisputed, and the instructions of the conductors, that unless otherwise requested cars should be left on a switch coupled, was no more than a precaution adopted to prevent the cars from rolling down grade and escaping to the main line. Their instructions were also that the brakes

should be left set, yet plaintiff admits 'that he knew that the brakes on the cars in question were not set.

We are requested to find as an additional fact, and do find in this connection, that when more than one car at a time was placed on any siding between Timpson and Carthage they were left standing coupled, unless they were separated or "spotted" by request of the mill men.

But the testimony copied and relied on in the request for additional findings demonstrates the soundness of our view. For instance, Butler testified: "They would generally spot my cars and put them where I wanted them. When they put in several cars at a time they would leave them coupled together, unless I had them spot them for me."

Ramsey testified: "When the cars were placed on the side track coupled and it was convenient for us to load them coupled, they would be left coupled, but when loaded from the planer we would have the cars switched where we wanted them." * * * The rest of this witness' testimony and that of Wade is to the same effect. We have quoted from the request for findings, the appellee having correctly taken it from the record.

From all this it seems to us too plain for argument that the company did not undertake to keep cars on the siding coupled for the safety of the men, even if it be conceded that they were to be *left* coupled by those who put them in, for it is undisputed that those for whose use they were put in had the right to move the cars where they pleased, and were supplied with the means of doing so. In truth it does not appear from the record whether the three cars in question were left uncoupled by the train operatives who put them in, or whether they were placed on the switch at one time and left coupled and were afterwards uncoupled by the mill hands. Let us suppose the latter to be true. The case would then stand thus: The train men left them coupled, as it was their duty to do, hence were guilty of no negligence. The mill men had uncoupled them, as they had a right to do, and as plaintiff knew they might do. It follows that the uncoupled cars furnish no basis for his suit. We repeat, there is no room for two opinions.

The motion for rehearing is overruled.

*Overruled.*

Writ of error refused.